Weldon, J.,
concurring:
Without going into the merits of this controversy on the different treaties made between-the parties to this proceed.! ing and the laws of the United States enacted from time to time affecting the liability and relation of the parties, I come to consider the legal effect of the finding made by the agents and officers of the United States under the agreement of December 19, 1891, described in the act of March 3. (27 Stat. L., p. 640, sec. 10.)
Commencing with the year 1835, in which year the treaty of New Echota was made with the Eastern Band of Cherokee Indians, disputes and differences existed between the United States and the Indians which culminated in the year 1891, when a treaty was made involving the sale and purchase of a district of country amounting in the aggregate to over 8,000,000 acres of land, known as the Cherokee Outlet. Aside from the intrinsic value of the lands there was a most material consideration moving to the United States in the necessity of having that tract of land; and, to the end that the United States might be the owner of that splendid domain of territory, they agreed to pay the Indians *333 the sum of $8,300,000; and, as a further consideration and inducement to the Indians to enter into such an agreement, it was stijmlated on the part of the United States as follows, to wit:
“ The United States shall, without delay, render to the Cherokee Nation, through an agent appointed by authority of the national council, a complete account of moneys due the Cherokee Nation under any of the treaties ratified in the years 1817, 1819, 1825, 1828, 1833, 1835-36, 1846, 1866, and 1868 and any laws passed by the Congress of the United States for the purpose of carrying said treaties or any of them into effect; and upon such accounting should the Cherokee Nation, by its national council, conclude and determine that such an accounting is incorrect or unjust, then the Cherokee Nation shall have the right within twelve months to enter suit against the United States in the Court of Claims, with the right to appeal to the Supreme Court of the United States, % either party, for any declared or alleged amount of money promised but withheld by the United States from the Cherokee Nation, under any of said treaties or laws, which may be claimed' to be omitted from or improperly or unjustly or illegally adjusted in said accounting. And the Congress of the United States shall at its next session after such case shall be finally decided and certified to Congress, according to law, appropriate a sufficient sum of money to pay such judgment to the Cherokee Nation should judgment be rendered in her favor; or if it shall be found upon such accounting that any sum of money has been so withheld, the amount shall be duly appropriated by Congress, payable to the Cherokee Nation, upon the order of the national council, such appropriation to be made by Congress if then in session, and if not, then at the session immediately following such accounting.”
The subject-matter of the consideration upon the part of the Indians was composed of two elements; in the first they were to receive the sum of $8,300,000, a part of the consideration of the conveyance, and as the second element of consideration they were to receive “ a complete account of the moneys due the Cherokee Nation ” under all the treaties and laws which from 1817 to 1868 had been made or enacted affecting the pecuniary relations of the parties. The account was to be accepted or rejected by the Indians as they might determine. It was known to them that an alleged settlement *334 bad been made in the year 1852, the legal effect of which had always been disputed by the Indians; and the agreement to render an account “ of moneys due ” “ to an unlettered party ” at least would be accepted as an opportunity to be relieved from the legal effect and binding force of the alleged settlement, by and through which they had been held at arm’s length through more than a generation of their people.
Then follows another provision well calculated to operate on the minds of the Cherokee Nation as a special and material inducement to.the making of the treaty or agreement of 1891. “And upon such accounting should the Cherokee Nation by its national council conclude and determine that such an accounting is incorrect or unjust, then the Cherokee Nation shall have the right within twelve months to enter suit against the United States in the Court of Claims,” with the right of appeal to the Supreme Court of the United States by either party for any declared or alleged amount of moneys.
The consideration therefore-consists of different elements of inducements, and in law those elements constitute and form the basis upon which the agreement rests, and none can be eliminated without the destruction of the entire force of the agreement.
The consideration though in parts and sections is a unit, and to disturb or eliminate one element is to destroy the whole. The consideration is the basis of the contract, and without its preservation as a whole the contract falls. .
The court must therefore assume that without all of the considerations the Cherokee Nation would, not have released to the United States a district of country large enough and rich enough to be one of the States of the Union.'
Much discussion has been indulged in upon the question as to whether the finding which was submitted to the Clierokeo Nation is an award, and if not an award, an account stated. It is not necessary to indulge in black-letter learning upon the legal effect or character of the “ account of moneys due the Cherokee Nation.” It was a statement of the account founded upon the legal theory of the Cherokee Nation, and for which the Indians had struggled through the years from *335 1835 to 1891. It to them was a slow and tardy relief from, the alleged iniquities and frauds of 1835, which, as they always thought, was the inception of their woes.
Upon the question as to whether the account rendered is in law an award or account stated, or whether it is either, is wholly immaterial to the proper settlement of the issue of this proceeding, and it is profitless to sagely balance the common-law question as to what constitutes either. It is sufficient for the 'purpose of this litigation to say that it is a material and lawful part of the consideration of a contract made by and between competent parties upon the subject-matter of which they had plenary jurisdiction.
In this connection it is apt .to quote what the Supreme Court has said in the case of Worcester v. State of Georgia. (6 Peters, 652) :
“ The language used in treaties should never be construed to their prejitdice. If words be made use of which are susceptible of a more extended meaning than the plain import as connected with the tenor of the treaty, they should be-construed as used in the latter sense.
sis sfs & ;{c :{?
“ How the words of the treaty were understood by this unlettered people, rather than in their critical meaning, should form the rule of construction. The question may'' be asked, Is no distinction to be made between a civilized and savage people? Are our Indians to be placed upon a footing with the nations of Europe with whom we have made treaties ?
“ The inquiry is not, what station-shall be given to the Indian tribes in this country, but what relation have they sustained to us since the commencement of our Government? We have made treaties with them, and are those treaties to-be disregarded on our part because they were entered into with an uncivilized people? Does this lessen the obligation of such treaties? By entering into them, have we not admitted the power of this people to bind themselves and impose obligations on us ? ”
So, in 5 Wallace, 737:
“ Buies of interpretation favorable to the Indian tribes are to be adopted in construing our treaties with them. Plence a provision in an Indian treaty which exempts their lands from ‘ levy, sale, and forfeiture ’ is not, in the absence of an expression so to limit it, to be confined to a levy and *336 sale under ordinary judicial proceedings only, but it is to be extended to levy and sale by county officers for nonpayment of taxes.”
Congress having failed to pay the amount found due under the treaty of 1891 by the report of Messrs. Slade and Bender, passed an act of 1902, by virtue of which this court has jurisdiction.
The matter of complying with the treaty of 1891 was left by the appropriation act (to defray the expense of furnishing a statement to the Indians) to the Commissioner of Indian Affairs under the direction of the Secretary of the Interior, as shown by the communication.
The Secretary in his communication to the Speaker of the House also transmits “ a certified copy of the Cherokee national council accepting such accounting.”
Up to that point the executive officers of the Government were proceeding step by step in the fulfillment of the promise made in the treaty of 1891, upon the faith of which the United States had acquired and were then in the-enjoyment of the “ Outlet.”
The United States had bought the land of the Indians not for the sum of $8,300,000, but for that sum and other undertakings vital as an inducement to the Indians in making the agreement of 1891.
Courts can not apportion the consideration of a contract and say this is material and that is immaterial; parties have the right to measure the value of what they contract for, and are entitled to have that recognized by the courts.
The Congress in ratification of the plan of settlement, as provided in the treaty of 1891, passed an act. appropriating the sum of $5,000 for the purpose of ascertaining the amount due the Cherokee Nation, and in pursuance of that act the Secretary of the Interior appointed James A. Slade and Joseph T. Bender to state the account then existing between the United States on one hand and the Cherokee Nation on the other, and in pursuance of such appointment and upon the fundamental authority of the agreement with the Indians made an examination, and upon the result of that examination made a report of the indebtedness of the United *337 upon the removal of the Indians under the various treaties was to be at the cost of the United States. It is not pretended that any mistake was made by the accountants upon the legal theory which they adopted as the basis of the liability of the defendants.
report Secretary of the Interior transmitted to Congress, through the Speaker of the House, the report of the expert accountants in the following communication:
DEPARTMENT OE THE INTERIOR,

“Washington, January 7th, 1895.

Sir : I have the honor to herewith transmit, in compliance with the provisions of the third subdivision of article two of the agreement made December 19th, 1891, with the Cherokee Indians, ratified by the act of Congress approved March 3rd, 1893 (27 Stats., 643), a certified copy of a complete account of money due the Oherohee Nation under any of the treaties made in the years 1817, 1819, 1828, 1835-6, 1846, 1866, and 1868, and any laws passed by the Congress of the United States for the purpose of carrying said treaties or any of them into effect, prepared in accordance with the provisions of said act of March 3rd, 1893, together ivith a certified copy of the Cherokee national council accepting such accounting. “
Very respectfully,
“ Hoke Smith, Secretary.
“ The Speaker op the House op Representatives.”
The account when rendered to the Cherokee Nation proved acceptable to it and upon the faith of its acquiescence in the report, as shown by the letter of the Secretary of the Interior, the council of the nation passed a formal acceptance of it.
If the United States were dissatisfied with the report of Slade and Bender, the dissatisfaction should have been manifested as soon as it was known to the authorities of the United States, who had in charge the matter, and not after the .Cherokee council had formally accepted the report as a correct statement of the account between the parties, and a formal delivery to the Cherokee Nation of a part of the consideration on which the bargain and sale of the land were made.
*338 The appointment of the expert from them of the result of the examination, and the transmittal of the report to the Cherokee Nation was the official act of the Secretary of the Interior, the officer who above all others has jurisdiction of the Indians of the United States. It is that Department of the Government which deals with the finances, and all other interests belonging to the Indians of the United States. The Secretary of the Interior and. the instrumentality of his Department is the medium through which the United States deals with “ the wards of the nation.”
The report which was to be furnished to the Indians for their acceptance or rejection has incident to it another important qualification, and that is if the Indians were dissatisfied with the statement of moneys due then they had the right to bring a suit against the United States within twelve months to settle by judicial determination the respective right of the parties. Relying on the good faith of the Government, the council of the Cherokee Indians accepted the. statement of Slade and Bender and thereby waived the right to bring a suit against the United States;'and, that right being waived, founded on the action of the United States, are they not now estopped from denying the legal effect of their own act ? The Indians were misled by the act of the United States when they assumed that the account after acceptance would be dealt with in pursuance of the other requirements of the treaty. Consider the rights of the litigants in thó light of the law which has been announced for nearly a century b}^ the Supreme Court of the United States,' the fundamental theory of which is that language must never be construed to their prejudice. (Worcester v. State of Georgia, supra.)
The position of the defendants in refusing to abide by the result of the treaty of 1893, consummated as it was by the act of the Cherokee council, the executive officers, and the lawful authorized agents of the United States, is not keeping faith with the wards of the nation in the spirit of that“ justice and reason ” recognized by the courts when dealing with the obligation of the United States as the guardian of the Indian.
*339 In the case of tlie Choctaw v. The United States (119 U. S. R., p. 1) it is said in the syllabi:
“ The relation between the United States and the Indian tribes, being those of a superior toward an inferior who is under its care and control, its acts touching them and its promises to them, in the execution of its own policy and in the furtherance of its own interests, are to be interpreted as justice and reason demand in cases where power is exerted by the strong over those to whom they owe care and protection. (United States v. Kagama, 118 U. S., 375, cited and applied.) ”
I concur in the result reached by the court as exemplified in the .opinion of the Chief Justice.